Scileppi, J.
This is an appeal from a judgment of the Appellate Division, Second Department, which affirmed a judgment of Supreme Court, Bangs County, convicting defendant (after the denial of his motion to suppress) on his plea of guilty to unlawful possession of a weapon as a misdemeanor.
At the suppression hearing Patrolman James Stevens was the only witness for the People. He testified that on October 20, 1968 he and a brother officer were investigating narcotic activity in the area of Jefferson Street and Howard Avenue in Brooklyn. At approximately 2:30 p.m. and while the officers were sitting in an unmarked car, a radio patrol car with two uniformed patrolmen pulled up beside them. One of the uniformed officers got out and informed Stevens that three burglaries had been *313 committed in the area that day and that 11 two males * * * had been seen in the vicinity of this block that we were sitting in ”. The uniformed officer then gave the following descriptions to Stevens and his partner:
“ The Court: What description did he give you?
‘1 The Witness : He gave us one male was six feet and wearing a camel hair overcoat with a brown hat.
“ The Court: White or Negro?
‘1 The Witness : Negro. Male number two was 5 feet 9, and all he had on him was a black hat. No further description.”
At 2:45 p.m., approximately 15 minutes after the uniformed officers had left, Stevens observed two men, the defendant and another, who fit the descriptions he had been given. Without taking any immediate action at this time, Stevens testified to the following events leading to the defendant’s arrest:
“ Q. What did you observe? What did you see? A. I saw the defendant and this other person walk into an apartment house. They stayed in there approximately 15 seconds. Came out. Looked in both directions and continued to walk in our direction and walked into another building. This time, the other person with the defendant came out first, looked up and down the street, looked back behind him, and then the defendant came out, and they continued to walk into our direction.
“ Q. How long did they stay in that building? A. Approximately 15 to 20 seconds.
“ Q. And you saw them go into two buildings at this point? A. That is correct.
“ Q. Did you then observe anything further? A. At the third — another building, the defendant walked into, and the other person with him stood out on the stoop or the doorway looking up and down, and at this particular time, I got out of the car and started to walk in their direction on the opposite side of the street. There came a time when the defendant and the other person with him came off the stoop and started walking in my direction on the other side of the street. I walked up to a point of where I had passed the defendant and the other person, crossed over to their side of the street, and started walking directly behind them. There came a time when my brother officer had crossed over onto the side of the street where the defendant and the other person were walking, and he approached *314 them, from the front, and I saw he had his shield in his left hand, and his hand on his revolver, and says, ‘ I am a police officer, Stop.’
“ Q. At that time, where were you? A. At this time, I was directly behind the defendant, James Mack.
‘ ‘ Q. What were you doing at that time ? A. At that particular time, I told the defendant to freeze.
“ The Court: What does that mean?
“ The Witness: ‘ Don’t move. I’m a police officer.’ I then told him to remove his hands from his coat pockets very slowly which the defendant did.
“ Q. Did you have a badge on your person? A. I did.
“ Q. Where was it? A. In my left hand.
“ The Court: How was the defendant dressed?
“ The Witness: The defendant had on a camel hair overcoat and a brown hat.”
& * *
“ The Witness: I told him not to move. I approached the defendant, from the rear and ran both hands down the side of his overcoat.
“ The Court : Is that in the form of a frisk?
“ The Witness: Yes, sir. And I felt a revolver in the defendant’s right coat pocket. I reached in and removed'the revolver from his pocket. I placed the defendant under arrest. ’ ’
After the defendant testified, the motion to suppress was denied. The court stated: “ I accept the police officer’s testimony as truthful and accurate and reject the defendant’s testimony as untruthful. Armed-with the knowledge imparted to him by the policeman in the patrol car to the burglaries in the area, and with the description of the persons seen in the immediate vicinity where the burglaries were committed, this officer’s observation of the two men who.fitted the description, the suspicious acts on their part, all justify the action taken by the officer. I hold that under Section 180-a of the Code, the detention and frisk were entirely lawful. The frisk produced the weapon, and defendant was properly arrested for the unlawful possession of the weapon. The motion is in all respects denied.”
On appeal the Appellate Division unanimously affirmed without opinion (30 AD 2d 776).
*315 Firstly, as stated earlier, Officer Stevens was the sole witness for the People. Since the reasonable suspicion giving rise to his stopping the defendant was at least in part based upon the information relayed by the unidentified uniformed police officer, defendant thought he was entitled to the production of this officer. The suppression Judge, however, thought otherwise and denied his motion. The defendant contends that the uniformed officer should have been produced because part of his information, the detailed description, was apparently not even a result of his own observations and thus his testimony was necessary to establish that the description was something more than mere rumor or unfounded speculation. Accepting this argument for the moment, the failure to produce the uniformed officer did not constitute reversible error for, even absent the detailed description, the knowledge of the occurrence of three burglaries in the area that day, coupled with the furtive conduct of the defendant and his companion, was sufficient to formulate a reasonable suspicion to justify the detention under the standards established by section 180-a of the Code of Criminal Procedure or at common law. Moreover, even if the description is a necessary ingredient to find reasonable suspicion herein, our recent decision in People v. Arthurs (24 N Y 2d 688, 691) recognizes that the burden on the People to produce the source and establish the reliability of information precipitating police action is quite different in the area of detentions based on reasonable suspicion, than in the area of arrests based on probable cause. We stated: “ Of course, the absence of the patrolman’s informants makes it impossible to verify the fact that there were such informants or that they gave the information he ascribed to them. But it would be requiring the impossible that in all street encounters, however brief and evanescent, the police officer must obtain documentation or witnesses to verify his every act. Moreover, it is not tenable that a police officer’s word should be so suspect, even in the sensitive area of search and seizure, that it may not be accepted unless corroborated like that of an accomplice criminal or complainant in a sex crime.” (supra, at pp. 692-693).
Accordingly, at that point in time when Officer Stevens first detained the defendant, his actions were in all respects proper. Of course, we must now turn to the primary question presented *316 —The propriety of the limited search for weapons more popularly known as the ‘ ‘ frisk ”.
In People v. Rivera (14 N Y 2d 441) we stated: “ If we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty. The answer to the question propounded by the policeman may be a bullet; in any case the exposure to danger could be very great. We think the frisk is a reasonable and constitutionally permissible precaution to minimise that danger. We ought not, in deciding what is reasonable, close our eyes to the actualities of street dangers in performing this kind of public duty.”
JL. 41. vv flr w
“ And as the right to stop and inquire is to be justified for a cause less conclusive than that which would sustain an arrest, so the right to frisk may be justified as an incident to mquiry upon grounds of elemental safety and precaution which might not initially sustain a search. ’ ’ (supra, at pp. 446, 447; emphasis added).
It is evident that the rule contemplated in Rivera was that because of the inherent danger to a police officer in confronting an individual he reasonably suspects to be a criminal, the officer should have the right to frisk as an incident to that inquiry so that he may neutralize any danger to himself or to others. The Legislature, however, in enacting section 180-a of the Code of Criminal Procedure and the Supreme Court in deciding Terry v. Ohio (392 U. S. 1) seem to have tempered the “ incidental frisk theory ’ ’ of Rivera by the establishment of a standard justifying the frisk separate and apart from that which will justify the detention (cf. People v. Rosemond, 26 N Y 2d 101).
Section 180-a provides :
“ 1. A police officer may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or any of the offenses specified in section five hundred fifty-two of this chapter, and may demand of him his name, address and an explanation of his actions.
‘ ‘ 2. When a police officer has stopped a person for questioning pursuant to this section cmd reasonably suspects that he is in danger of life or limb, he may search such person for a dangerous weapon. If the police officer finds such a weapon or any other *317 thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.” (emphasis added).
And in Terry the Supreme Court stated: “ When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm,” (supra, at p. 24). Thus it is clear that the officer who reasonably suspects that an individual is committing, has committed or is about to commit a crime does not necessarily have the right to frisk unless that suspicion or other information gives rise to an independent belief that the individual is presently dangerous.
In applying the above test it is our opinion that the limited intrusion herein should be sustained.
While it is true that Officer Stevens could not particularize his belief of danger as well as the officers did in People v. Taggart (20 N Y 2d 335) and People v. Arthurs (supra), where there was information linking the defendants with weapons, his belief of danger was surely just as real and just as reasonable.
Where a police officer detains an individual whom he reasonably suspects has committed a crime such as forgery, policy, gambling or the like, depriving the police officer of the right to frisk, unless he has some other information to formulate a reasonable suspicion of danger, is understandable. Where, however, the officer confronts an individual whom he reasonably suspects has committed, is committing or is about to commit such a serious and violent crime as robbery or, as in the instant case, burglary, then it is our opinion that that suspicion not only justifies the detention but also the frisk, thus making it unnecessary to particularize an independent source for the belief of danger.
As Justice Harlan- stated in his concurring opinion in Terry, what he believed to be implicit in the majority’s opinion: ‘ ‘ Where such a stop is reasonable, however, the right to frisk must be immediate and automatic if the reason for the stop is, *318 as here, an articulable suspicion of a crime of violence. Just as a full search incident to a lawful arrest requires no additional justification, a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet.” (Terry v. Ohio, supra, at p. 33).
We agree and adopt this rationale in the belief that to hold otherwise would unnecessarily endanger police officers in the performance of the already hazardous task of investigating serious criminal activity.
Accordingly, the judgment of conviction should be affirmed.