■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MILTON LA PENE, III, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered January 18, 1973, convicting him of

attempted possession of weapons and dangerous instruments and appliances, as a felony, upon his plea of guilty, and imposing sentence. The appeal brings up for review an order of the same court, dated December 5, 1972, which denied defendant's motion to suppress physical evidence. Judgment and order affirmed. No opinion. Rabin, Acting P. J., Martuscello, Cohalan and Brennan, JJ., concur; Shapiro, J., dissents and votes to reverse the judgment and order and to dismiss the indictment, with the following memorandum: The sole question presented on this appeal is the propriety of a frisk of the defendant's person.

## THE FACTS

On December 4, 1971 Police Officer Sheeran and his partner were riding in a radio patrol car. They received a radio bulletin that at a place called Jean's Bar "there was a man in back of the bar with a gun, wearing a red shirt, and he was a male Negro." Concededly, the information furnished to Officer Sheeran and his partner was based upon an anonymous tip received by the police radio sender.[1] Acting upon the information thus relayed to them, the two officers, accompanied by another officer who had arrived in another radio car, entered the premises. Sheeran immediately went to the rear, where he observed defendant standing at the back of the crowded bar with his hands in his pockets, busily engaged in conversation with a few other customers. He was wearing dark pants and a red shirt which covered his trousers. Without addressing defendant in any way, and without checking to see whether any other black men in the bar were attired in red shirts, and although defendant concededly was not acting in a suspicious or furtive manner, and without seeing a bulge or any other protrusion on defendant's person, Sheeran told him to "freeze" and raise his hands. Defendant did as he was directed. A frisk of his person revealed a hard object which, when recovered by the officer, turned out to be a .25 caliber automatic containing seven live rounds of ammunition. Upon those facts, Criminal Term denied defendant's motion to suppress the revolver. In my opinion, the motion should have been granted.

## THE LAW

In seeking to uphold the validity of the frisk of defendant, the People rely principally upon *People v Taggart* (20 NY2d 335). In my view the *Taggart* holding is factually distinguishable and, in any event, can no longer be regarded as authoritative. In *Taggart*, (p 337) a detective testified that he had received a telephone call from an anonymous informant that "a male, white youth" on a specified corner "had a loaded. 32 calibre revolver in his left hand jacket pocket". The youth was described as 18 years of age, with "blue eyes, blond hair" and wearing "white chino-type pants". The detective went to the scene and observed the defendant, "standing in the middle of a group of children that had just finished bowling". The defendant "matched perfectly" the description given to the detective by the anonymous informant. The detective crossed the street, took the defendant "by the arm and put him against the wall and took the revolver out of his left-hand jacket pocket". The Court of Appeals noted that the detective, arguably, might not have had reasonable grounds for believing that defendant actually possessed a pistol. However, the seizure of the pistol (which was technically not a

---

1. Sheeran, on cross-examination, stated that he *believed* that the radio call resulted from an anonymous tip. Our inquiry of the Assistant District Attorney in charge of the appeals bureau confirmed the anonymous nature of the tip.

"frisk") was upheld under the then applicable "Stop and Frisk" law (Code of Crim Proc, § 180-a). The court noted that it had recently upheld the validity of that legislation in two cases, *People v Sibron* (18 NY2d 603) and *People v Peters* (18 NY2d 238). This case is factually distinguishable from *Taggart* in that the description was less accurate, little or no effort was expended to determine whether any of the other persons present in the bar conformed to the description, and no danger was presented to any children. More importantly, not only has *Taggart* not been followed in later cases, its underpinnings have been removed by the Supreme Court of the United States. In *Terry v Ohio* (392 US 1), a detective had observed *suspicious* conduct by three men which justified his belief that a serious crime was about to be committed. The court noted that the Fourth Amendment applies to "stop and frisk" procedures; that a "search" of the three had taken place, which search produced two pistols; and that a reasonably prudent officer, in the circumstances of a given case, may be warranted in a belief that his safety is endangered and, in such circumstances, may make a reasonable search for weapons; but the court rejected the rule enunciated in *Taggart* that a "stop and frisk" is not a search governed by Fourth Amendment standards. It noted (p 17) that: "The danger in the logic which proceeds upon distinctions between a 'stop' and an 'arrest' or 'seizure' of the person, and between a 'frisk' and a 'search' is twofold. It seeks to isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen. And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation." The court went on to explain that those dangers were illustrated by holdings in the Court of Appeals of New York to the effect that a frisk was not a search. It pointed out that, in *Taggart,* the Court of Appeals was "compelled to recognize" that it had authorized searches upon less than probable cause. It continued (p 18, n 15): "However, in acknowledging that no valid distinction could be maintained on the basis of its cases, the Court of Appeals continued to distinguish between the two in theory. It still defined 'search' as it had in *Rivera*—as an essentially unlimited examination of the person for any and all seizable items—and merely noted that the cases had upheld police intrusions which went far beyond the original limited conception of a 'frisk'. Thus, principally because it failed to consider limitations upon the scope of searches in individual cases as a potential mode of regulation, the Court of Appeals in three short years arrived at the position that the Constitution must, in the name of necessity, be held to permit unrestrained rummaging about a person and his effects upon mere suspicion. It did apparently limit its holding to 'cases involving serious personal injury or grave irreparable property damage,' thus excluding those involving 'the enforcement of sumptuary laws, such as gambling, and laws of limited public consequence, such as narcotics violations, prostitution, larcenies of the ordinary kind, and the like.' *People v Taggart, supra,* at 340 * * * In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusions, in light of all the exigencies of the case, a central element in the analysis of reasonableness. Cf. *Brinegar v United States,* 338 US 160, 183 (1949) (Mr. Justice Jackson, dissenting). Compare *Camara v Municipal Court,* 387 US 523, 537 (1967). This seems preferable to an approach which attributes too much significance to an overly technical definition of 'search,' and which turns in part upon a judge-made hierarchy of legislative enactments in the

criminal sphere. Focusing the inquiry squarely on the dangers and demands of the particular situation also seems more likely to produce rules which are intelligible to the police and the public alike than requiring the officer in the heat of an unfolding encounter on the street to make a judgment as to which laws are 'of limited public consequence.' " In *Sibron v New York* (392 US 40), which was handed down on the same day as *Terry,* the Supreme Court passed upon the two cases *(People v Sibron,* 18 NY2d 603, *supra,* and *People v Peters,* 18 NY2d 238, *supra)* relied upon in *Taggart* for the proposition that a search unauthorized by the Fourth Amendment may nevertheless be upheld under the "stop and frisk" law. That rationale was disposed of out of hand by the statement that the State "may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct" *(supra,* p 61). Accordingly, the court declined to pass upon the "facial constitutionality" of the New York statute, holding that the particular conduct would be tested under the requirements of the Fourth Amendment. In a footnote it again criticized *Taggart,* noting that "At least some of the activity apparently permitted under the rubric of searching for dangerous weapons may thus be permissible under the Constitution only if the 'reasonable suspicion' of the criminal activity rises to the level of probable cause" *(supra,* p 61, n 20). In *Sibron* the Supreme Court noted that a police officer is not entitled to seize and search every person he sees or of whom he makes inquiries saying: "Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous" *(supra,* p 64; see, also, *Adams v Williams,* 407 US 143, 145). The Court of Appeals, apparently in recognition of the constitutional Pandora's box which it opened in *Taggart,* in its later consideration of subsequent "stop and frisk" cases, while not directly overruling *Taggart,* has applied more rigorous standards in considering the legality of such searches. Thus, for example, it has indicated that a police officer must act either on reliable information or on facts available to him which connect the individual to a weapon (see *People v Mack,* 26 NY2d 311, 317-318; *People v Moore,* 32 NY2d 67, 70). It has also recognized a right to "stop and frisk" in cases where the "stop" is for a "serious and violent crime" (see *People v Mack, supra; People v Moore, supra,* p 70). In *Moore (supra),* the court, in upholding a search for weapons, apparently realized the weakness of *Taggart* as authority, for it noted that "It is necessary to emphasize that this is not a case where the informant is anonymous" *(supra,* p 71). That fact was of importance since, under section 240.50 of the Penal Law, the informant would have been chargeable with falsely reporting an incident had his information proved to be false. That fact created a basis for a reasonable belief in his reliability. It is noteworthy, in this regard, that the Court of Appeals has held that the fact that an anonymous informant has correctly described the defendant does not establish the informant's reliability (see *People v Horowitz,* 21 NY2d 55, 58). In *People v Green* (35 NY2d 193), an alleged eyewitness reported an attempted robbery to a police officer, furnished a description of the perpetrator, and said that the latter was in possession of a gun. That eyewitness later pointed out the defendant to the officer. At a later approach of police officers, the defendant walked away from them. He was stopped and a frisk revealed the gun. The stop and frisk were upheld even though the officer had not made a note of the name and address of the eyewitness, who was no longer present. In upholding the

frisk, the court said (p 196): "In our view this case approaches the limit for a finding of reasonable suspicion prerequisite to a frisk (cf. *People v Bronk,* 31 NY2d 995). *There is a difference of significant degree between a report only that a person has a gun in his possession and another report that a person not only has a gun but that he has just used it for the commission of a crime.* Similarly turning the defendant around by his arm for a pat down is not the same as a bear-hug grab from the rear by one not known to be an officer of the law. *A citizen walking our streets should not, without more, be exposed to physical assault by a police officer on the basis of an unsubstantiated report of the mere possession of firearms volunteered by a stranger. To condone such conduct would be to expose innocent persons to harassment by pranksters and irresponsible meddlers.* As indicated, however, there was more in the case now before us" (emphasis supplied). In the recent case of *People v Cantor* (36 NY2d 106) the court gave full expression to the constitutional limitations upon the right of police to stop and search an apparently law-abiding citizen. It noted that "Whenever an individual is physically or *constructively* detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment" *(supra,* p 111 [emphasis supplied]). It went on to add (pp 112–113) that: "Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. (Compare Schwartz, Stop and Frisk: A Case Study in Judicial Control of the Police, 58 J. Crim. L. C. & P. S. 433, 445 with La Fave, 'Street Encounters' and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich L Rev 40, 70.) To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice *(Terry v Ohio,* 392 US 1, *supra; Wong Sun v United States,* 371 US 471, 479). Nor will good·faith on the part of the police be enough to validate an illegal interference with an individual (e.g., *Terry v Ohio, supra; Henry v United States,* 361 US 98, *supra; Hill v California,* 401 US 797; *Smith v County of Nassau,* 34 NY2d 18)." In deciding suppression issues in gun cases "Courts should not be blind to what is happening in our streets every day" *(People v Tinsley,* 48 AD2d 779), and should decide such matters with a realization that police in the performance of their duties are constantly in jeopardy and have no time to cogitate on the refinements of our criminal laws. In the final analysis, however, and giving every reasonable leeway to police conduct, we may not sanction infringement of the basic constitutional rights of any defendant. Thus, in this case, in which the police acted solely on the basis of a tip from an anonymous informer who reported no criminal act having been committed by the defendant, other than the alleged possession of a gun, and in which they observed no suspicious conduct on the part of the defendant, there was no basis for the stop of the defendant (in reality an arrest) by ordering him to "freeze" (cf. *People v Rosemond,* 26 NY2d 101; *People v Ingle,* 36 NY2d 413, 418), nor for the subsequent frisk.[2] Accord-

---

2. We realize that in the first instance police may act on information furnished them through police channels—as Officer Sheeran did here—but when it is determined upon a suppression hearing that the original police information was based upon a mere tip or came from an unsubstantiated source the original apparent

ingly, the judgment and order should be reversed and the indictment dismissed.

---

probable cause disappears and suppression must be ordered *(People v Lypka,* 36 NY2d 210, 213–214).