■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN LE GRAND, Appellant.

On April 27, 1982, at 10:30 P.M., Police Officers Louis Christiansen and William Schroh, while on uniformed patrol in a marked radio patrol car, received a radio run of "robbery in progress, man with a gun" at 1784 University Avenue in The Bronx. The cross streets at that location were 176th Street and Macombs Road. While the officers were proceeding south to that location, they received another radio transmission, at about 10:34 P.M., that a male black was still at that location, a Mobil gas station. Officers Christiansen and Schroh arrived at the gas station at about 10:37 or 10:38 P.M. It was raining very hard at the time.

Officer Christiansen, a veteran of 14½ years, had his gun drawn upon approaching the gasoline station. The officers spoke to the sole attendant on duty, Efraim Roman, who told them that the black male robber was no longer there but had fled towards Macombs Road, towards the rear of the gas station. Mr. Roman told the officers that the robber was a "big black guy" with a gun and, in describing his size, gestured with his hands out to his side almost parallel to the floor, indicating "a rather large individual."

Officers Christiansen and Schroh exited the gas station on Macombs Road directly opposite 176th Street where it intersects Macombs Road. From the corner, Christiansen observed a couple of black males down the block, approximately 150 to 200 feet from the corner, standing in the doorway of an apartment building at 74 West 176th Street, which was 200 to 300 feet from the Mobil station.

Officer Christiansen testified that this was a designated "robbery target area" which also had a number of other problems, i.e., 75% of the buildings were burned out and/or bricked up; there was a known narcotics area directly east of the building where defendant was arrested; and on nearby Harrison Avenue, stolen cars were "dumped and stripped."

At the apartment building, there were three steps leading up to a vestibule, and outside that vestibule were four men of medium height and thin to moderate build; inside the threshold of the doorway was defendant, a "tall man", who stood out above the other four and was larger than the others. Based on the pedigree information supplied by defendant after his arrest, Officer Christiansen listed defendant as being six feet, three inches tall and 260 pounds.

Defendant was holding by the collar, in his left hand, a black midlength overcoat. (There had been a notation on the radio sprint report for 10:41 P.M. that the black male robber was wearing black and had on a black hat. Officer Christiansen vaguely recalled hearing that information on the radio but could not say whether it was before or after he left his vehicle and saw defendant.)

At 10:39 P.M., approximately nine minutes after receiving the original radio run, Officers Christiansen and Schroh exited their marked patrol car with their guns drawn. This precaution was taken based upon the nature of the radio run (armed black male) and the street itself. Officer Christiansen observed defendant, in the vestibule, turn and start walking up the stairs. Upon rounding the vehicle and reaching the sidewalk, Officer Christiansen shouted to defendant to "halt, don't move." Defendant stopped and looked over his shoulder. Christiansen then went past his partner and the four black males, entered the vestibule and joined the defendant on the right side of the same step. Officer Schroh, due to the nature of the street situation and the inclement weather, escorted the four black men into the vestibule at gunpoint and stood at the left side of the base of the steps. Officer Christiansen, who had his gun drawn, told defendant, who was holding the coat out to his side, to face him. Defendant complied and started to put the coat down. The defendant was told by Christiansen not to move, and Christiansen conducted an unfruitful frisk of his waist. Officer Christiansen now asked defendant to put the coat down so as to avoid its potential use as a weapon. As the coat came in contact with the marble step, Officer Christiansen heard a "clunk". He then conducted a fruitless pat down of defendant's back.

Christiansen, who had made approximately 35 weapon arrests, next went to the coat and felt a small, hard object in the pocket. Believing it to be a gun, he reached in the pocket and retrieved a .32 caliber revolver. The officer then handcuffed and arrested defendant for the possession of the gun. A subsequent search of his right front pocket disclosed two .32 caliber bullets. A search of the other four males and the hallway failed to disclose the fruits of the robbery. The defendant was brought back to the Mobil station, where Roman said he was not the robber.

Under the totality of the circumstances here, the action of the police was entirely reasonable and proper. The radio transmissions, the description of the perpetrator and direction of flight provided by Roman, the proximity in time and location between the occurrence of the robbery and the apartment building where

defendant was spotted, and defendant's act of turning and walking up the stairs, all gave Officer Christiansen reasonable suspicion to believe defendant was the armed perpetrator. As such, the officer was justified in approaching defendant (*see, People v De Bour,* 40 NY2d 210). The combination of the facts that the officer believed the man was armed, that he and his partner could be outnumbered should the four males standing outside decide to come to defendant's aid, and that the building was located in a robbery target area consisting of burned-out and bricked-up buildings, justified the officer's fear for his safety and that of his partner. Thus, the fact that the officer approached defendant with his gun drawn, and then frisked him, was reasonable under the circumstances (*People v Chestnut,* 51 NY2d 14, *cert denied* 449 US 1018; *People v Benjamin,* 51 NY2d 267).

In addition, since the coat, still in defendant's possession, could have been used as a weapon, the officer acted prudently in ordering defendant to lower it. Upon hearing the "clunk" sound made as the coat pocket came in contact with the marble step, Christiansen, street-wise, and who had made at least 35 arrests, after frisking defendant's back, properly went to the coat, which remained within the ambit of defendant's grasp. Since the recovery of the gun from the coat and defendant's subsequent arrest for possession of the gun were lawful, the search of defendant's right-front pants' pocket and the recovery of bullets were incident to a lawful arrest and therefore proper. Concur — Sandler, J. P., and Asch, J.; Fein, J., concurs in a separate memorandum; Kassal, J., concurs in the majority memorandum as well as in the concurring memorandum of Fein, J.

Fein, J. (concurring). I concur in result.

The issue turns on whether the police had sufficient information as a predicate for their action in requiring defendant to stop and submit to a frisk at gunpoint (*People v Stewart,* 41 NY2d 65). The threshold inquiry must focus on the source and type of information received or observed by the police. These factors are to be compared to the level of intrusion exercised as a response to the circumstances and whether the predicate for police action warrants the action taken (*People v Stewart, supra; People v De Bour,* 40 NY2d 210).

The determination will depend upon a balancing of the legitimate interests of the defendant as against the reasonableness and appropriateness of the police action. As stated in *People v Prochilo* (41 NY2d 759, 761-762), each case must be examined on its own terms, keeping in mind at least three aspects of the activity involved: "Was there proof of a describable object or of

describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession? Was the manner of the officer's approach to the defendant and the seizure of the gun from him reasonable in the circumstances? Was there evidence of probative worth that there had been a pretext stop and frisk or that the police were otherwise motivated by improper or irrelevant purpose? There will be other material considerations, too, in individual cases. Because the totality of the circumstances in each case is necessarily unique, there should be no expectation that comparable significance will always attach to the same or similar factors in different cases."

In this case there was plain evidence that an armed robbery had been committed. There was, first, a radio run describing the location. Next, when the police proceeded to the gas station at that location, the Hispanic victim of the robbery, who spoke limited English, described the robber as a large black man who was armed and who had run from the scene to the rear of the gas station. Although there was more than one street that the police might have followed, it was perfectly reasonable for them to select the street on which they found the defendant. Since he fit the limited description given by the gas station attendant, it was reasonable to request him to stop. Whether he was walking up the steps within the vestibule because he observed the police or was there for some other reason does not appear. Nor is it controlling. The question is whether the stop at gunpoint was appropriate.

Plainly, in the light of the fact that the police were looking for an armed robber, and the defendant fit the limited description given to them, the gunpoint stop was not unreasonable (*People v Chestnut,* 51 NY2d 14, *cert denied* 449 US 1018; *People v Benjamin,* 51 NY2d 267).

The next question is whether, having been stopped at gunpoint, an inquiry was required before a search was undertaken. Under the circumstances, and with the possibility of danger to the officer, the search was warranted without an initial inquiry, although it is obvious that the danger to the officer was lessened because the stop was at gunpoint (*cf. People v Benjamin, supra*).

The fortuitous "clunk" heard by the officer when the defendant put his coat down at the officer's direction provided a reasonable basis for a search of the coat and the discovery of the weapon. Although I doubt its materiality, I cannot accept the majority's conclusion that it was proper for the officer to tell defendant to put the coat down, because it might have been used as a weapon. It is notable that when defendant sought to put his coat down, the officer told him not to do so.

However, this should not end our inquiry. Implicit in this case is another problem. Are 4th Amendment rights to freedom from "unreasonable searches and seizures" to be lessened because the events take place in a "high crime area" or "robbery target area"? A long line of cases, particularly drug and gun suppression cases, describes the area in which the activity under scrutiny occurred, as here, as high crime areas. Thus the courts may be in the process of carving out a high crime area exception limiting 4th Amendment rights of persons in such areas. I very much doubt that those who reside or work in such areas or those who have a reason to travel through or visit in such areas can or should be required to sacrifice or yield their constitutional rights.

This case makes the point. As the court's memorandum states, the four other black men in the vicinity of the defendant, who did not fit the description of the victim, were herded into the lobby of the building at gunpoint and each was searched. The majority notes, without comment: "A search of the other four males and the hallway failed to disclose the fruits of the robbery. The defendant was brought back to the Mobil Station, where Roman said he was not the robber."

Thus, although defendant was not the robber, and there was no evidence that the robber had been accompanied by others during the robbery, the four persons who happened to be in the vicinity of the defendant were subjected to a gunpoint stop and search. Even if the gunpoint stop of the four be deemed reasonable in order to protect the officer who searched the defendant, there was no reasonable basis to search them. It is plain that their 4th Amendment rights were violated, although it does not lie in the mouth of this defendant to assert their rights and they are not likely to do so. If, indeed, as it states, the 4th Amendment is designed to protect "against unreasonable searches and seizures" what is to be said to those who happen to be on the street in a "high crime" neighborhood?

Obviously, we are all aware of the problems faced by the police in the streets of our city in dealing with information concerning criminal activity and the risks they run in apprehending suspects. However there must also be a concern for the rights of those who live in the areas involved. I doubt that their rights as against police interference can constitutionally be more limited than the rights of those who live, work or travel in other areas. The suggestion that activity in a high crime area should be dealt with on a different scale or at a different level than that in other areas is to invite more problems than it solves. Is the ordinary citizen in such an area entitled to react to what appears to be

criminal activity at a more or less restricted level than is warranted in other areas?

A police officer, despite the absence of any concrete indication of criminality, may approach a private citizen on the street to request information if he has some articulable reason to justify the action (*People v De Bour, supra*). The stop, however, must not be the product of "mere whim, caprice, or idle curiosity" (*People v Ingle,* 36 NY2d 413, 420). A police officer is authorized to stop and forcibly to detain if he entertains a reasonable suspicion that a person has committed, is committing, or is about to commit a felony or misdemeanor (CPL 140.50 [1]; *Terry v Ohio,* 392 US 1; *People v De Bour, supra; People v Cantor,* 36 NY2d 106), and to frisk if he reasonably suspects that he is in danger of physical injury (CPL 140.50 [3]; *People v De Bour, supra*). The four individuals who were stopped at gunpoint, seized and searched do not appear to have been engaged in any antecedent or current conduct evincing criminality.

Although none of this is of any aid to this defendant, it appears to be appropriate, in a case such as this, to raise what I deem to be a significant issue as to the rights of residents and other people in so-called "high crime areas". I doubt their 4th Amendment rights can be limited because of the locale in which they happen to reside, work or visit. Such a result would be dangerous. We cannot permit our concern with criminals to turn selected neighborhoods into places where police can make gunpoint stops of citizens who are doing no wrong (*see, People v Green,* 35 NY2d 193, 196).