# THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOSEPH BRONSTON, Respondent.

First Department, January 7, 1986

## APPEARANCES OF COUNSEL

*Julian A. Hertz* for respondent.

*Richard T. Preiss* of counsel *(Charles E. Knapp* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

## OPINION OF THE COURT

FEIN, J.

The People appeal from an order which granted defendant's motion to suppress a loaded .38 caliber revolver taken from defendant's waistband.

The issue is whether the investigating officers were required to make any inquiry of defendant concerning his conduct prior to the search and seizure. The People's only witness at the *Mapp* hearing was Police Officer Stephanie Sheffler, a three-year member of the New York City Police Department, who testified that on September 14, 1984 at approximately 4:30 A.M. she and her partner, who were on motor patrol, received a "radio run of a * * * 1031 burglary in progress", at a roller disco located at 155th Street and Eighth Avenue in Manhattan. "The call called for a man on a fire escape, another man on the ground * * * The description stated one man had a red shirt and the one other wore dark clothing * * * Black males." She further testified:

"Q: When you arrived what if anything did you observe?

"A: I observed one male black on the fire escape standing at the top it and one male black at with the red shirt standing in the doorway."

As the dissent notes, the tapes of both the 911 call and the radio transmission were played at the hearing. The dissent suggests that the persons described were reported to be "up on the roof there, on a fire escape." However, this was the version transmitted by the desk officer, who was not a witness to the events. As noted, the officer's testimony was that the report placed the man in dark clothing at the top of the fire escape and the man with the red top at the doorway. This was consistent with the anonymous call received by the police.

Although she had never been inside the one-story building, Officer Sheffler knew that it contained a social club. The officers reached the scene within minutes. Officer Sheffler observed defendant standing at the top of the single-story 12-foot high fire escape on the alleyway side of the building. He was described as wearing an open "denim jacket and jeans, dark blue."

On the street, at the entrance to the social club, there was another black man in a "red t-shirt and * * * jeans". The officer observed no other pedestrians. The entire premises appeared to be closed, and she testified that "[t]he gates were down".

Officer Sheffler stepped out of the patrol car with her service revolver drawn and approached defendant, while her partner proceeded in similar fashion toward the other individual. Officer Sheffler ordered defendant to come down from the fire escape at gunpoint. He hesitated, asking if he could descend by way of an interior stairway. She testified that defendant, after repeated orders to come down the fire escape, descended and was immediately placed "against the wall and frisked". She admitted that no questions were asked and conceded that there was nothing in defendant's hands, and that he made no movement, furtive or otherwise, during the period that she had him under observation. She testified:

"Q: And did he walk down casually?

"A: It's impossible to walk casually down the—

"Q: Did he bolt down the steps?

"A: He came down very carefully because it's a dangerous thing to move down.

"Q: In your opinion, that you should be careful when you come down those steps because he might fall or injure yourself?

"A: No, I am saying that that's how he came down, cautiously, holding on because he was on the side, he was on the fire escape."

The dissent suggests that defendant's delay in coming down the fire escape indicated some improper motive or behavior. The record does not support this conclusion. As noted, the police officer herself stated that it was "dangerous" to descend and that she kept defendant under observation at gunpoint throughout.

Defendant testified:

"I said I can't come down because the fire escape is broke. Let me come around and I'll come down the stairs.

"She told me to climb down. I said okay. So I started to climbing down, even though the fire escape was broke. I was taking my time, carefully, so I don't fall.

"The fire escape—when you step on the fire escape, it leads

straight to the ground. And then she handcuffed me, put me up against the wall, and that was it."

The officer testified:

"Q: When he got to the ground what did you do?

"A: I placed him against the wall and frisked him."

She further testified:

"Q: Did you have a conversation with Mr.—let me put it this way: Before or after they arrested him?

"A: After."

It is undisputed that the officer made no inquiry of defendant before placing him against the wall.

Defendant testified:

"Q: Did she pat you down, as she testified?

"A: She pat me down one time when she had me handcuffed and put me up against the wall. Then she pulled me from the wall, and then she pat me down again, and that's when she found the weapon."

She never asked him questions as to what he was doing there.

The suppression Judge found that defendant had been handcuffed before the officer patted him down. The dissent rejects that finding on the ground of credibility. However, the basis for the dissent's conclusion does not appear. The portion of the officer's testimony quoted in the dissent demonstrates only that although Officer Sheffler testified several times that she placed defendant against the wall, she was never questioned concerning whether she handcuffed defendant before she patted him down. The sole direct testimony in the record on this question is that of defendant. Hence, support is lacking for the dissent's conclusion that defendant lied. There is no warrant for rejecting the finding of the suppression Justice. However, this is not dispositive. It is undisputed that there was a gunpoint search and arrest of defendant before any inquiry was made as to the reason for or basis of his presence at the top of the fire escape. The officer proceeded solely on the basis of an anonymous report of two men on a fire escape, alleged to be engaged in a "robbery", transmitted as a "burglary in progress". When the officers arrived, what they observed confirmed the presence of defendant and another at the premises. It did not confirm the anonymous caller's characterization of such presence as criminal. No conduct on the part of defendant or the other man gave any appearance of criminality, unless we are to conclude that a black man, standing on a

one-story commercial building at 4:30 A.M., smoking a cigarette, in what is described as "a high crime area", provides probable cause for the conclusion that a crime is being committed or is about to be committed.

Nothing observed by the officers indicated the necessity for an arrest and frisk or search before any inquiry was made. Obviously, the officers had a reasonable basis for proceeding to the scene to check whether a "robbery" or burglary was in progress, on the basis of the information supplied in the radio run. However, when the officers arrived there was no activity on the part of the defendant suggesting criminal behavior. Defendant made no furtive or suspect movements which would instill a fear for safety. Defendant did as he was told, at gunpoint, after first questioning the necessity of descending on an admittedly "rickety and dangerous" fire escape.

It is notable that the other identifiable suspect was apparently not questioned, or if questioned, was released. If, indeed, there was a burglary in progress, he, too, was subject to arrest.

Nothing in the record even suggests that defendant did not actually have a legitimate right to be on the premises. Defendant's claim of employment at the social club was not questioned, and no inquiry was made with respect thereto. Moreover, there was no proof that the entire building was closed for the evening. Defendant testified that people came out of the club while the arrest was in progress, and that the other officer went into the club. However, the man in the "red top" was not arrested. Thus, it is clear that however accurate the radio run may have been as to the presence of the two individuals on the scene, there was not a shred of evidence of criminal activity once the officers arrived.

The People now suggest that at least there was a trespass. However, this would require some evidence, totally lacking here, that defendant had no right to be on the roof, or at the top of the fire escape of the premises. Thus, *People v Elwell* (50 NY2d 231) and *People v Rodriguez* (52 NY2d 483), both cited by the dissent, cut the other way. The police observations on the scene confirmed the presence of defendant, but there was no evidence of criminal activity. As stated in *Elwell* (50 NY2d, at pp 234-235), "We affirm the Appellate Division's holding that for police observation to constitute the verification that will establish probable cause and permit a warrantless search or arrest predicated upon data from an informer

who has not revealed the basis for his knowledge, it is not enough that a number, even a large number, of details of noncriminal activity supplied by the informer be confirmed. Probable cause for such an arrest or search will have been demonstrated only when there has been confirmation of sufficient details suggestive of or directly related to the criminal activity informed about to make reasonable the conclusion that the informer has not simply passed along rumor, or is not involved (whether purposefully or as a dupe) in an effort to 'frame' the person informed against."

The officer's own observations did not indicate that a crime was being or had been committed. The conduct observed was " 'too equivocal' " *(People v McRay,* 51 NY2d 594, 602; *People v Russell,* 34 NY2d 261, 264). There was no cause to believe that defendant was engaged in the commission of a crime. Hence, Officer Sheffler could not lawfully arrest defendant and search him as an incident thereto *(People v Stokes,* 57 AD2d 797). Once the officers were upon the scene, no identifiable criminal activity was observed *(cf. People v McRay, supra; People v Landy,* 59 NY2d 369, 375).

Although the combination of the information on the radio run and defendant's presence at the scene created a basis for inquiry, nothing observed permitted further action such as a frisk, search or arrest.

*People v Mack* (26 NY2d 311), relied on by the dissent, is not to the contrary. There, a uniformed officer had informed the arresting officer, 15 minutes before the arrest, that three burglaries had been committed in the area, and gave descriptions of the suspects. One of the descriptions fit the defendant. In that case the arresting officer was informed that the burglaries had been committed on that day. The description given for one suspect included that he was six feet tall and wore a camel's hair coat and a brown hat. Such clothing was worn by the defendant who fit the description when arrested. Plainly the circumstances in *Mack* were different and authorized a greater police intrusion than here present. There, three burglaries had been committed. Here, no evidence of criminal activity was ever developed.

It is well settled that the predicate for police action and the level of intrusion warranted depends in each case upon the information furnished to the police combined with police observations at the scene *(People v Stewart,* 41 NY2d 65; *People v Stroller,* 42 NY2d 1052). Here, there was no observed

activity of defendant sufficient to justify the level of intrusion. Although inquiry was warranted, "there was nothing that made permissible any greater level of intrusion" *(People v Howard,* 50 NY2d 583, 590, *cert denied* 449 US 1023). Unlike in *People v La Pene* (the companion case to *People v De Bour,* 40 NY2d 210, 225), the anonymous report here did not even mention the presence of weapons. There was simply no indication defendant might be armed. As *De Bour* makes clear, a search illegal at its inception cannot be validated by what it produces. Other than the initial observation by police of a solitary figure on the rooftop of a commercial building and another in the ground-floor doorway, there was no evidence of criminal activity warranting a search or frisk, with or without handcuffs, without prior inquiry. Defendant made no effort to flee or to discard any property. He was doing that which he claimed to be doing when the police arrived—smoking a cigarette. The totality of his conduct did not justify the level of the intrusion.

The principle is stated in *De Bour.* (40 NY2d, at p 216): "We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation, will constitute probable cause".

It is still not a crime to smoke a cigarette on a rooftop of a commercial building, even at 4:30 A.M. Nor does the anonymous caller's characterization of such behavior as a "robbery" or a burglary make it so *(People v Elwell,* 50 NY2d, at pp 236-237). The officer's observations merely confirmed defendant's presence at the top of the fire escape, not that he was engaged in criminal activity.

The dissent and the People rely heavily on the assertion that these events occurred in a "high crime area". Much has been written about patterns of behavior of persons engaged in narcotics transactions in "high crime" areas as providing a foundation for a reasonable conclusion that a sale is in progress when such conduct is observed. However, it is surely questionable whether the fact that events occur in a high crime area justifies a greater level of intrusion than is warranted by the same behavior in other areas *(see, People v McRay,* 51 NY2d, at p 606 [Fuchsberg, J., concurring], *supra; People v Le Grand,* 110 AD2d 539, 542-545 [Fein, J., concurring]).

On the evidence in this case, there was neither reasonable suspicion warranting a frisk, nor probable cause justifying a

search and seizure. The obligation of the police in responding to such a radio run should be the same, whether in a high crime area or any other area of our city. Unless we are to conclude that a man smoking a cigarette on the rooftop of a commercial building at 4:30 A.M. in one part of the city is more likely to be engaged in criminal activity than in another part of the city, in 4th Amendment terms the response should not differ.

As stated in *People v Cantor* (36 NY2d 106, 113, 112-113), "To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice *(Terry* v. *Ohio,* 392 U. S. 1 * * * *Wong Sun* v. *United States,* 371 U. S. 471, 479). Nor will good faith on the part of the police be enough to validate an illegal interference with an individual (e.g., *Terry* v. *Ohio, supra; Henry* v. *United States,* 361 U. S. 98 * * * *Hill* v. *California,* 401 U. S. 797; *Smith* v. *County of Nassau,* 34 N Y 2d 18)."

"Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand."

As stated in *People v Russ* (61 NY2d 693, 695), "No inquiry was made of defendant so she neither refused to answer nor answered evasively (see *People v Klass,* 55 NY2d 821); no suspicious bulge was perceived in her clothing (cf. *People v De Bour,* 40 NY2d 210, 213); no furtive movements were made by her (see *People v Benjamin,* 51 NY2d 267 * * * )".

On this record there is no evidence of any investigation as to whether there was a burglary. The record points the other way. Nor is there any evidence contradicting defendant's claim that he was an employee of the social club.

There was insufficient here to justify an arrest or a frisk without an initial inquiry.

Accordingly, the order, Supreme Court, New York County (Kristin Booth Glen, J.), entered February 14, 1985 granting defendant's motion to suppress the loaded .38 caliber revolver recovered in his waistband, should be affirmed.

KASSAL, J. (concurring). I agree that there should be an

affirmance of the order which granted defendant's motion to suppress and dismissed the indictment.

In my view, taking into account that the police were responding to a radio run concerning a 911 report of a burglary in progress, the officer was justified in proceeding with utmost caution, particularly considering all of the circumstances, the area, the location of the incident and the time of day. When the police arrived on the scene, what they observed confirmed the accuracy of the report in terms of the position of the defendant on the fire escape. However, there was nothing else to indicate that there actually was a burglary in progress. The fact that the defendant was standing on the fire escape, smoking, albeit at 4:30 A.M., did not, in and of itself, give rise to a founded suspicion that criminal activity was afoot so as to justify the actions taken by the officer before any inquiry had been made. Thus, while I find the situation warranted great care, the type of response, consisting of a frisk following a gunpoint seizure before any inquiry had been made, was improper under the circumstances.

SULLIVAN, J. (dissenting). The People appeal from the grant of defendant's motion to suppress a gun, which he has been charged with possessing. Both the arresting officer and defendant testified at the suppression hearing.

Police Officer Stephanie Sheffler, a three-year member of the New York City Police Department, testified that on September 14, 1984, at approximately 4:30 A.M., she and her partner, who were on motor patrol, received a radio report of a possible burglary in progress at a roller disco at 155th Street and Eighth Avenue in Manhattan. The perpetrators were described as two black men, one dressed in dark clothing and the other wearing a red top. They were reported to be "up on the roof there, on a fire escape." The tape of both the 911 call and the radio transmission was played at the hearing. Insofar as is relevant, the caller told the police operator:

"I would like to report a robbery going on at 155th Street & Macombs at the Rooftop Roller Skating Disco * * *

"I see some people going up and down the fire escape—there's two guys, they're right in the front—it looks like they're looking out, and the place is closed * * *

"It's a ground level disco. It doesn't have but one level. They're going up the fire escape. It's one of those fire escapes that teeter."

Although she had never been inside the building in question,

a one-story structure, Officer Sheffler knew that it contained a social club. She was also familiar with the high incidence of crime in the area.

The officers were at the scene within a matter of minutes. The building's gates were down and it appeared to be closed. Defendant, a black man dressed in a denim jacket and dark blue jeans, was standing at the top of the fire escape. Officer Sheffler also observed a second black man, with a red shirt, standing in the doorway. Alighting from the patrol car with her gun drawn, as her partner headed toward the red-shirted man some 40 feet away, Officer Sheffler approached the fire escape, on which defendant stood 12 feet overhead, and ordered him down. When defendant asked if he could use the inside stairway, Officer Sheffler, unfamiliar with the building's inner structure, repeated her order. Defendant complied. When he reached the ground, Officer Sheffler, without further inquiry, placed him against the wall and patted him down, in the course of which she recovered a holstered, loaded .38 caliber revolver from his front waistband. Defendant was immediately arrested.

Defendant testified that he was employed at the social club, working primarily as a cleaner between midnight and 8:00 A.M. At the time of his arrest he was carrying a gun which, earlier that evening, one of the club's workers, a man he knew only as Kurt, had asked him to hold. Several times that night he had gone to the roof for some air and to smoke a cigarette. On his last visit, as he sat near the fire escape, smoking, he heard whistling. Looking up at the adjoining viaduct overhead he saw two police officers, who, with guns drawn, ordered him not to move. On the street a female officer, with her gun also drawn, asked him what he was doing and ordered him down from the fire escape. When his request to come down through the building stairway was rejected, he descended the fire escape.

Once on the ground, defendant, his protests that he worked at the social club notwithstanding, was handcuffed by the female officer who, nervous and frightened, asked him to step against the wall and patted him down. Finding nothing, the officer pulled defendant away from the wall and patted him down again, at which time the gun was discovered and seized.

In granting the motion to suppress the court found neither probable cause for an arrest nor justification for a frisk. Despite its finding that Officer Sheffler's observations at the

scene confirmed the anonymous tip, it ruled that, as a matter of constitutional law, a lawful arrest could not be predicated upon the "mere confirmation" of such tip without affording defendant an opportunity to explain himself. Although conceding that Officer Sheffler had a reasonable basis "for temporarily detaining" defendant for questioning, the court found that she had no basis upon which to believe that he was armed. Moreover, since it accepted defendant's testimony that Officer Sheffler handcuffed him before she placed him against the wall and frisked him, the court found that the officer was not in any danger. Thus, the frisk could not be justified. Since I believe that, given the circumstances confronting her, Officer Sheffler's conduct in ordering defendant, at gunpoint, to come down from the fire escape and frisking him was eminently proper, I would reverse and deny the motion to suppress.

As the 911 tape makes clear, an anonymous caller, an obvious eyewitness to the events he was describing, reported what he believed to be a burglary in progress. He identified the building and described the perpetrators, who were reported "going up and down the fire escape." This information was then relayed to Officer Sheffler and her partner who, within minutes, responded to the scene. There, at 4:30 in the morning, in a high crime area, Officer Sheffler saw defendant on the fire escape and another man in the doorway of a commercial building which in all respects appeared closed. These observations alone were enough to compel the conclusion that a crime was being committed. The reasonableness of this conclusion was only heightened by the validation of the anonymous caller's information. Not only did the two men match the description of the perpetrators but one of them, defendant, was still on the fire escape, as the caller had reported. Thus, Officer Sheffler knew that these were the same two men who, minutes earlier, had been on the roof or fire escape, and whose activities had aroused the suspicions of the anonymous caller. The reliability of the anonymous caller and the basis of his knowledge are established simultaneously by the officer's own observations (People v Elwell, 50 NY2d 231, 237; see, People v Rodriguez, 52 NY2d 483, 489-490, 493-494). These observations and the content of the radio transmission provided probable cause. "Probable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrant a conviction * * * but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is

being or was committed". *(People v McRay,* 51 NY2d 594, 602.) Having probable cause to believe that defendant was engaged in the commission of a crime, Officer Sheffler could lawfully arrest him and search him as an incident thereto. *(People v Stokes,* 57 AD2d 797.)* Thus, the gun was lawfully recovered as an incident to an arrest.

The suppression court believed, however,° that the mere confirmation of the anonymous caller's information was insufficient and that, as a matter of constitutional law, Officer Sheffler was obliged to afford defendant the opportunity to explain his actions before any formal arrest could take place. The requirements of probable cause, however, do not impose any such duty. Confronted with a situation fraught with danger, and in receipt of information which leads him to believe that he is witnessing a crime, a police officer should not be powerless to act until he has engaged a suspected criminal in conversation. In any event, probable cause is not vitiated by a suspect's mere assertion of an innocent explanation for his conduct. Nor did the circumstances confronting Officer Sheffler impose a duty to inquire.

Moreover, even if Officer Sheffler did not have probable cause to arrest defendant based on her observations, her actions were nevertheless reasonable under the circumstances. She knew that two men had been observed on the roof or the fire escape of a closed building. Upon arriving at the scene, she was able to confirm the information provided in the radio transmission. The building was located in a high crime area. These factors, taken together, certainly formed the basis, at the very least, of a reasonable suspicion that defendant was committing or had committed a burglary. At that point Officer Sheffler had the right to stop defendant and inquire about his activities as well as the concomitant right to frisk him to neutralize any danger to herself. When an officer "confronts an individual whom he reasonably suspects has committed, is committing or is about to commit such a serious and violent crime as * * * burglary * * * that suspicion not only justifies the detention but also the frisk, thus making it unnecessary to particularize an independent source for the belief of danger." *(People v Mack,* 26 NY2d 311, 317.)

The suppression court, however, found that defendant was handcuffed before he was frisked and that therefore he posed no danger to her. Thus, the court held, Officer Sheffler's conduct could only be justified by a finding of probable cause. Such a factual finding was unjustified and unreasonable and

does not bind this court. Officer Sheffler's testimony that defendant was frisked before he was arrested was straightforward and clear:

"Q. Did the defendant eventually come down off the fire escape?

"A. Yes, he did.

"Q. When he got to the ground, what did you do?

"A. I placed him against the wall and frisked him.

"Q. When you say frisked, what exactly did you do?

"A. Pat down his outer clothing.

"Q. And in the course of that pat down, what did you do?

"A. I felt a bulge in front of the—I reached in. He had a gun concealed in the waistband in a holster.

"Q. What type of gun was it?

"A. Loaded .38—

"Q. What did you do after that?

"A. I placed the defendant under arrest * * *

"Q. But he was coming down carefully and you had him under your observation from the time he first saw him until the time he hit the ground?

"A. Yes.

"Q. And you saw nothing on him then?

"A. Not that I can remember.

"Q. And then you asked him to place his hand up or you ordered him to place his hands on the wall and you proceeded to search him?

"A. Yes."

Given defendant's obvious motive to lie about the incident, there was no reasonable basis for disregarding such testimony and crediting instead defendant's uncorroborated and self-serving testimony to the contrary.

Accordingly, the order appealed from should be reversed, the motion to suppress denied and the matter remanded for further proceedings.

ELLERIN, J., concurs with FEIN, J; KASSAL, J., concurs in a separate opinion; KUPFERMAN, J. P., and SULLIVAN, J., dissent in an opinion by SULLIVAN, J.

Order, Supreme Court, New York County, entered on February 14, 1985, affirmed.