■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES WATTS, Appellant. [840 NYS2d 69]—

Judgment, Supreme Court, New York County (Herbert J. Adlerberg, J.H.O., at suppression hearing; Micki A. Scherer, J., on suppression decision; Edwin Torres, J., at jury trial and sentence), rendered March 10, 2005, convicting defendant of burglary in the second degree, and sentencing him, as a second violent felony offender, to a term of 10 years, unanimously affirmed.

The court properly denied defendant's motion to suppress physical evidence. Sometime after 11:00 P.M., on March 3, 2004, the arresting officers, on foot patrol at 111th Street and Second Avenue, received a radio communication which was the product of an anonymous 911 call concerning a mailbox being taken by two described men at a building at 331 East 109th Street. Defendant and his codefendant matched the transmitted descriptions: they were both dressed in dark clothing and one of them, the codefendant, was wearing a yellow "hoody" as described in the radio run. They were the only persons in the vicinity of the reported crime. As the officers approached the two men, they observed what appeared to be "sheetrock dust" and plaster on the pants and shoes of both men. When asked where they were coming from, the men pointed in the direction of 331 East 109th Street. At the suppression hearing, the seizing officer, McElligott, testified that his observation of white powder was significant because, as he recalled, the radio run had reported two suspects "breaking into a business through mailboxes." The audiotape of the actual police radio dispatch merely reported "mailbox being taken." When the two men could not produce identification, one of the officers, concerned for his safety, frisked defendant, during which the officer reached into defendant's pants pockets and removed a screwdriver from his right front pocket and a key from his left front pocket. One of the officers noticed dust on the tip of the screwdriver. Two pairs of gloves—one rubber, the other work—were recovered from the codefendant. After recovering those items, the officer asked the two men what they were doing in the area and they gave "inconsistent" answers. A backup officer then escorted defendant and the codefendant back to the apartment building at 331 East 109th Street. The lobby area contained a bank of mailboxes on a wall separating the lobby from an adjacent laundromat. The plaster around the mailbox frame appeared to have been "chipped away." The officers did not learn that the key recovered from defendant fit the front door of the building until

after defendant had been arrested and transported to the police station.

The suppression court properly rejected defendant's argument that the seizing officer lacked reasonable suspicion to stop and frisk him. A forcible investigatory stop and detention, falling short of an arrest, is justified where there is reasonable suspicion—defined as "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" (*People v Cantor*, 36 NY2d 106, 112-113 [1975])—that a person has committed or is about to commit a crime. When a police officer confronts an individual whom he reasonably suspects has committed an inherently dangerous crime such as burglary, that suspicion alone justifies not only detention, but also a frisk for weapons (*People v Mack*, 26 NY2d 311, 317 [1970], *cert denied* 400 US 960 [1970]). Here, when the officers approached defendant and his codefendant, Officer McElligott immediately recognized sheetrock dust and "some sort" of plaster on the shoes and pants of each of them. With this telltale sign of the removal of a mailbox from a building wall, the subject of the 911 call, the officers engaged both men in a request for information. Only after the two men stated that they had no identification and confirmed that they were coming from the area of the apartment building in question did Officer McElligott conduct a protective frisk out of concern for his own safety. By that time the officer's initial observations of sheetrock dust on the men's clothing supported a reasonable suspicion that they may have been involved in the burglary (*see id.*).

Defendant stresses the fact that the radio communication was limited to a report of "mailbox being taken," not that suspects were "breaking into a business through mailboxes," as Mc-Elligott thought. Despite the semantics, the plaster dust on defendant's pants and sneakers and those of his codefendant was alone indicative of the type of criminality reported in the anonymous call (*see People v Hall*, 23 AD3d 151 [2005]). Thus, the officers reasonably could have concluded that the theft of a mailbox would most likely be accomplished by pulling it out of a building wall, which would account for the suspects' dusty appearance. In addition, the two men were unable to furnish identification and indicated that they were coming from the vicinity of the apartment building where the crime had taken place. The police observations provided sufficient corroboration of the anonymous call to render it "reliable in its assertion of illegality, not just in its tendency to identify a determinate person" (*cf. Florida v J.L.*, 529 US 266, 272 [2000]). Thus, the

officers had reasonable suspicion of criminality, and they properly conducted a protective frisk. The additional police investigation at the scene provided the officers with probable cause.

While the recovery of the key, which—given its size and easily recognizable dimensions—could not have been mistaken for a weapon, was the result of a seizure that went beyond the permissible scope of a stop and frisk, defendant never raised this issue either before the motion court or now on appeal. In arguing for suppression, he never made a distinction between the key and the screwdriver. The issue is thus unpreserved (*see* CPL 470.05 [2]; *People v Velasquez*, 188 AD2d 394 [1992], *lv denied* 81 NY2d 795 [1993]), and we decline to reach it in the interest of justice (CPL 470.15 [3] [c]; [6] [a]).

We reject defendant's argument that the court's response to a note from the deliberating jury improperly removed the "intent to commit a crime therein" element of burglary in the second degree (Penal Law § 140.25) from the jury's consideration. The court received a note from the deliberating jury asking, "Is taking down the mailbox an intent to commit a crime?" Before responding to the jury, the court stated to counsel, "Yes, I will respond to that. And you have an objection." When the jury returned, the court, as promised, simply restated the question aloud and responded, "Yes." Almost immediately thereafter, the court repeated its original instructions on the elements of burglary and the definition of intent, in which it clearly informed the jury that intent is a question of fact upon which the prosecution bears the burden of proof beyond a reasonable doubt. After the court's delivery of this supplemental instruction, defendant raised no objection to any part of the charge and sought no further clarification. Thus, notwithstanding the court's remark "you have an objection," defendant's claim is unpreserved (*see* CPL 470.05 [2]; *People v Velasquez*, 188 AD2d 394 [1992], *supra*) and we decline to reach it in the interest of justice. Were we to reach this claim, we would find that given this context, there is no reasonable possibility that the jury could have misunderstood the court's response as a statement that intent had been established. The court neither stated its opinion nor directed a verdict with regard to the element of intent; rather, in context, it told the jurors that if they found that defendant had removed the mailboxes from the wall, such an act could satisfy the "intent to commit a crime therein" element if the jurors so determined. Finally, we note that the issue of intent was not contested. The fact that a burglary had been perpetrated was never at issue at trial. Only defendant's involvement was in

question. Concur—Mazzarelli, J.P., Sullivan, Sweeny, Catterson and McGuire, JJ.